1

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                 **FOR THE EASTERN DISTRICT OF CALIFORNIA**

8

9   S.A., a minor, By and Through L.A.,              CASE NO. CV F 10-347 LJO SMS
    guardian ad litem,
10
                    Plaintiff,                        **ORDER ON CROSS-SUMMARY**
11                                                    **JUDGMENT MOTIONS; (**Docs. 24, 26)
                                                      **ORDER ON PRELIMINARY INJUNCTION**
12                                                    **MOTION** (Doc. 40)

13                  vs.

14  EXETER UNION SCHOOL DISTRICT,

15                  Defendant.
    _____/

16                              **INTRODUCTION**

17         Plaintiff S.A., ("Student"), by and through his guardian ad litem, L.A. ("Mother"), appeals an

18  order from an education due process hearing pursuant to the Individuals with Disabilities Education

19  Improvement Act ("IDEIA"), 20 U.S.C. §1415(i)(2)(A).  By notice on October 12, 2010, Student and

20  defendant Exeter Union School District ("District") filed cross-motions for summary judgment.  The

21  issue presented is whether the October 7, 2008 individualized education program ("IEP") provided

22  Student a free appropriate public education ("FAPE"), or whether the IEP denied Student a FAPE

23  because District predetermined an offer of services without allowing Student and Mother meaningful

24  participation in its development.  While the summary judgment motions were pending, Student filed a

25  preliminary injunction motion, seeking an order to require District to provide Student behavioral

26  supervision services through an alternate non-public agency.  For the reasons discussed below, this Court

27  DENIES Student's summary judgment motion and GRANTS District's summary judgment motion.  In

28  addition, this Court DENIES Student's preliminary injunction motion.

                                        1

**BACKGROUND**

**Factual History**

Student is a minor child who is eligible for special education and related services because he has autism and autistic-like behaviors. Student resides within the District boundaries, and attended District schools during all relevant times. In June 2002, District determined that Student was eligible for services as a student with exceptional needs. Because of Student's behavioral needs, he requires a behavior support program and concomitant supervision. Student has received these services since he was in kindergarten. This dispute arose as the parties prepared for Student's fourth grade school year.

Student's triennial IEP to determine his goals, accommodations, and offer of services for the 2008-2009 school year commenced on May, 28, 2008. The IEP continued on June 2, 2008, September 8, 2008, and resulted in an offer of services on October 7, 2008. Student's detailed IEP spans 60 pages. A total of fifteen people attended each of the IEP meetings, including Mother and her attorney. The offer of behavioral supervision services made at the October 7, 2008 IEP is the focus of this action.

Student receives both in-home and at-school behavior support and services. Student has received in-home services from multiple non-public agencies ("NPAs"). In 2006, Mother "heard good things" about ACES, an NPA that provides behavior support services. Mother suggested that District use ACES for Student's behavioral supervision services, and District agreed. Thus, Student began receiving both in-home and at-school behavior services from ACES.

Behavior services are provided in a three-tier system. At the first level, Student has an aide who stays with him for a certain number of minutes each day, implementing recommendations and collecting data on Student's goal performance. On the next level, Student has a behavior supervisor who oversees, evaluates, and makes recommendations to the aide. The behavior supervisor also analyzes the data collected by the aide. At the top level is a senior supervisor who oversees, evaluates, and consults with the supervisor, and makes further recommendations. All members of Student's behavior team, including in-home and at-school staff, and his parents participate in monthly clinic meetings to discuss Student's progress.

At ACES, Carrie Hicinbothom ("Ms. Hicinbothom") was Student's behavior supervisor. Ms. Hicinbothom worked with Student beginning February 2008. At the time of the October 7, 2008 IEP,

Ms. Hicinbothom was working towards her board certified behavior analyst certification ("BCBA"), and had one class left to complete. Jennifer Sutera ("Ms. Sutera") was the ACES senior supervisor assigned to Student. Ms. Sutera had, among other things, a BCBA. In October 2008, Student's ACES behavior supervisor was in transition from Ms. Hicinbothom to Amber Botello ("Ms. Botello"). At the time of the October 7, 2008 IEP, Ms. Botello did not have a BCBA.

In July 2008, District, through its Superintendent Renee Whitson ("Superintendent Whitson"), made a decision to allow its contract with ACES to elapse. According to Superintendent Whitson, District did not renew its contract with ACES because of District's inability to control the NPA's provision of services and attendance at meetings. Superintendent felt uncomfortable with contracting out services for which District remains legally responsible. In addition, the needs of the District and County had grown, allowing District and County to use resources to hire a behavior supervisor and senior behavior supervisor. Although the contract was not renewed in July 2008, District continued to pay ACES to provide Student in-school services.

At the October 7, 2008 IEP, District offered Student behavior services that were the same as those services then-provided with one exception–District offered to change the behavior supervision provider from ACES to the District and County. District offered Ron Pekarek ("Mr. Pekarek") to be Student's senior supervisor and Katherine Wu ("Ms. Wu") to be Student's behavior supervisor. Mother requested to meet Ms. Wu and Ms. Wu entered the IEP. The length of time Ms. Wu attended the IEP is in dispute. It is undisputed that Ms. Wu entered the IEP near the end, but may have stayed at the meeting between 30 and 90 minutes. It is undisputed that Mother or her attorney, who also attended the IEP, asked Ms. Wu no questions. Mother did not agree to District's offer at the conclusion of the October 7, 2008 IEP.

Mr. Pekarek is a County employee. He is Director of the County Bright Future program, a behavior services program that provides in-home and at-school behavior services. Mr. Pekarek has a BCBA. He teaches the BCBA program at Fresno Pacific University. He has ten years of experience working with autistic children. Mr. Pekarek presents 4-5 workshops per year, and fifteen three-hour workshops per quarter for an autistic certification. He was appointed to the Central Valley Regional Task Force, Early Identification and Intervention, commissioned by the United States Senators of

California. Mr. Pekarek was familiar with Student, as he assessed Student in March 2008. Mr. Pekarek discussed that assessment at the following IEPs, and was present at the May 28, June 2, September 8, and October 7, 2008 IEPs.

Ms. Wu works for District as a school psychologist. She has her Masters of Education degree, and is a board certified behavioral analyst. At the time of the October 7, 2008 IEP, Ms. Wu had one class left to complete in her BCBA program. She had experience with autistic children, ages 3-7. Mr. Pekarek was her BCBA program professor and mentor. They worked together as part of the course, but not as part of an official IEP for a student.

In addition to the aforementioned concerns, Superintendent Whitson was further unhappy with the transition between Ms. Hicinbothom and Ms. Botello. Accordingly, District decided to terminate services with ACES on November 30, 2008.

**Procedural History**

District filed a due process complaint in the OAH seeking a a determination that the October 7, 2008 offer provided Student a FAPE. Student filed a cross-complaint, arguing that the October 7, 2008 offer denied Student a FAPE. The actions were consolidated. After a two-day hearing, Administrative Law Judge Gary Geren ("ALJ") issued a December 9, 2009 decision in favor of District. The ALJ ruled that the October 7, 2008 IEP offered Student a FAPE. Student appeals that decision.

In his summary judgment motion, Student argues that District's predetermination of the IEP denied Student a FAPE. County moves for summary judgment in its favor, arguing that County's offer of services at the October 7, 2008 IEP provided Student with a FAPE. The parties fully briefed the cross-motions for summary judgment.

During the pendency of the administrative hearing and this appeal, District had agreed to continue providing behavior services through ACES to Student. Recently, however, ACES unilaterally terminated its services to Student. In response, District offered to provide behavioral supervision services through District and County staff; namely, Mr. Pekarek and Ms. Wu. Student rejected this offer, arguing that District's offer was the "very action disputed in this case." Accordingly, Student moved for a preliminary injunction and "stay put" order to order District to provide behavior services to Student by a different NPA. The parties fully briefed this issue.

4

1   Having considered the parties' arguments, the administrative record, and the applicable case law,

2   this Court found these motions suitable for a decision without a hearing.  Accordingly, this Court vacated

3   the November 30, 2010 and December 2, 2010 hearings, pursuant to Local Rule 230(g), and issues the

4   following order.

5                                                   **SUMMARY JUDGMENT MOTIONS**

6                                                       **Standards of Review**

7   While called a "motion for summary judgment...the procedure is, in substance, an appeal from

8   an administrative determination, not a summary judgment." *Capistrano Uni. Sch. Dist. v. Wartenberg*,

9   59 F.3d 884, 891 (9th Cir. 1995).  "When a party challenges the outcome of an IDEA due process

10  hearing, the reviewing court receives the administrative record, hears any additional evidence, and

11  'bas[es] its decision on the preponderance of the evidence.'" *R.B. v. Napa Valley Unified Sch. Dist.*, 496

12  F.3d 932, 937 (2007) (quoting 20 U.S.C. §1415(i)(2)(B)).  Based on this standard, "complete de novo

13  review of the administrative proceeding is inappropriate." *Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d

14  811, 817 (2007).  The party seeking relief in this Court bears the burden of demonstrating that the ALJ's

15  decision should be reversed. *Clyde K. V. Pullayup Sch. Dist., No. 3*, 35 F.3d 1396, 1399 (9th Cir. 1994).

16  In addition, the party challenging the administrative decision bears the burden of persuasion on each

17  claim challenged.  *Id.*[1]

18                                                     **Basic Floor of Opportunity**

19  While a student's IEP must be reasonably calculated to provide him or her with educational

20  benefit, school districts are required to provide only a "basic floor of opportunity." *Rowley*, 458 U.S. at

21  200-01.  Thus, an "'appropriate' public education does not mean the absolutely best or 'potential-

22  maximizing' education for the individual child." *Gregory K. v. Longview Sch. Dist*, 811 F.2d 1307, 1314

23  (1987).  However, "Congress did not intend that a school system could discharge its duty under the

24  IDEA by providing a program that produces some minimal academic advancement, no matter how

25  trivial." *Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.*, 267 F. 3d 877, 890 (9th Cir. 2001).

26

27  [1]The Individuals with Disabilities Education Act of 1997 ("IDEA") was re-authorized and amended by the
    Individuals with Disabilities Education Improvement Act of 2005 ("IDEIA").  The IDEIA became effective on July 1, 2005.
    Accordingly, the substantive provisions of the IDEIA govern this action.  *See Amanda J. v. Clark County Sch. Dist.*, 267 F.3d

28  877, 882 n.1 (9th Cir. 2001).  The rules of law applicable to the IDEA are applicable under IDEIA unless otherwise noted.

**Snapshot Evaluation**

The standard for evaluating IEPs, commonly called the "snapshot" rule," is not retrospective. *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999).   As the *Adams* court explained

> Instead of asking whether the [IEP] was adequate in light of the [Student's] progress, the district court should have asked the more pertinent question of whether the [IEP] was appropriately designed and implemented so as to convey [Student] with a meaningful benefit.  We do not judge an [IEP] in hindsight; rather, we look to the [IEP's] goals and goal achieving methods at the time the plan was implemented and ask whether these methods were reasonably calculated to confer [Student] with a meaningful benefit...In striving for "appropriateness," an IEP must take into account what was, and what was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted.

195 F.3d at 1149.

**Deference**

In review of an IDEA due process hearing, courts give "less deference than is conventional" in review of other agency actions." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993). "How much deference to give state educational agencies, however, is a matter for the discretion of the courts." *Gregory K. V. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987).  The Court, "in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue.  After consideration, the court is free to accept or reject the findings in part or in whole." *Id*.; *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467 (9th Cir. 1993).

"'[D]ue weight' must be given to the administrative decision below and [] courts must not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" Van Duyn, 502 F.3d at 817 (quoting Rowley, 458 U.S. at 206).  "[T]he amount of deference afforded the hearing officer's findings increases where they are thorough and careful." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995).  This Court gives deference to an ALJ's decision "when it 'evinces his [or her] careful, impartial consideration of all the evidence and demonstrates his [or her] sensitivity to the complexity of the issues presented." *County of San Diego v. California Special Educ. Hrg. Off.*, 93 F.3d 1458, 1466 (9th Cir. 1996).

Student argues that this Court should afford no deference to the ALJ's decision, because the ALJ's decision was not careful, and the ALJ was not impartial.  Student contends that the ALJ: (1) lost

impartiality when he questioned witnesses in an adversarial, rather than neutral, manner; (2) used inappropriate standards to determine the credibility of witnesses; and (3) refused to review evidence that he acknowledged to be "factually probative and persuasive."  The Court considers these challenges to determine the appropriate standard of review. *R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 942-43 (9th Cir. 2007).

This Court gives deference to an ALJ's decision "when it 'evinces his [or her] careful, impartial consideration of all the evidence and demonstrates his [or her] sensitivity to the complexity of the issues presented." *County of San Diego v. California Special Educ. Hrg. Off.*, 93 F.3d 1458, 1466 (9th Cir. 1996).  As the Ninth Circuit Court of Appeals explained in *Napa Valley*, 496 F.3d at 942-43, a Court "treat[s] a hearing officer's findings as "'thorough and careful' when the officer participates in the questioning of witnesses and writes a decision contain[ing] a complete factual background as well as a discrete analysis supporting the ultimate conclusions."

Having read and reviewed the transcripts of the two-day hearing, the ALJ's decision, the parties' arguments, and the record, this Court finds that the ALJ's decision was thoughtful, legal, impartial and correct.  The ALJ's 17-page decision, rendered after a two-day hearing, contains a detailed factual background and analysis.  The ALJ explains his legal conclusions thoroughly,  includes citations to the relevant facts and discusses and applies applicable law.  Additionally, the ALJ was involved actively in the hearing.  The ALJ questioned many witnesses, both to clarify responses as well as to elicit follow-up responses.  Accordingly, this Court shall give due weight to the ALJ's decision and shall give particular deference to the ALJ's decision to the extent it was "thorough and careful."

Student perceived the ALJ's active involvement in the hearing to be impartial; however, this Court finds no evidence of impartiality on the record or in the ALJ's decision.  During the hearing, the ALJ made clear to both parties that he would ask questions, and he questioned witnesses presented by both Student and District.  There is no evidence that the ALJ questioned any witness in an adversarial manner.  Although the ALJ actively questioned Superintendent Whitson for a lengthy period of time, there is no evidence that the ALJ inappropriately credited her responses based on that questioning.

Moreover, the evidence does not support Student's assertion that the ALJ gave preferential treatment to the District and its witnesses.  The ALJ was helpful to both District and Student witnesses.

For example, the ALJ allowed Mother to respond in a narrative, non-responsive manner multiple times. Although Mother was, at turns, non-responsive and evasive, the ALJ never admonished this witness. Indeed, the ALJ showed patience and respect to Student's witnesses, who repeatedly interrupted the ALJ. The record demonstrates that the ALJ did not prefer one party over the other.

Student's challenges to the ALJ's conduct and analysis contain factual errors or mischaracterizations. Student contends that the ALJ's decision was not "thoughtful and thorough" because the ALJ found that Mother could not recall the details of Ms. Wu's or Ms. Hicinbothom's qualifications. Student asserts that this finding is "factually inaccurate," and asserts Mother "discussed the qualifications of both individuals during her direct examination." Student uses this as an example of the ALJ's "lack of care and attention to testimony." The portion of the transcript to which Student cited, however, reveals that Mother did not know Ms. Botello's credentials, and only generally knew Ms. Sutera's credentials. In other areas of testimony, Mother testified that she did not know well Ms. Wu's or Ms. Hicinbothom's credentials.

Similarly, Student's challenge to the ALJ's denial of Student's request for official notice is inaccurate. Student claims that the ALJ "reverses holdings and disregards stipulations and orders he makes during the trial, doing so without notice to the parties or an opportunity for them to be heard." To support this assertion, Student contends that during the hearing, the ALJ stated that a February 2, 2009 Compliance Report by the California Department of Education ("compliance report") was "certainly pro-factual, factually persuasive evidence[.]" Student contends that the ALJ stated that the compliance report was relevant to the substantive issues and was admissible as legal authority. Student argues that based on these statements, he relied on the compliance report in his written closing statement, and requested official notice of the compliance report. Notwithstanding the ALJ's previous statements to admit the compliance report, Student argues, the ALJ improperly denied the request and "dramatically reversed his prior statements in the hearing." Student's argument is based on a selective reading of the transcript.

Student never offered the compliance report as evidence during the trial; rather, the compliance report was contained in District's evidence binder. A discussion arose as to its admissibility during the hearing. While initially the ALJ considered the compliance report to be admissible and relevant, the ALJ

changed his mind after a lengthy argument by the parties.  District–the party seeking to admit the compliance report–chose to withdraw it as an exhibit.  Later in the hearing, District confirmed that it withdrew the compliance report as an exhibit.  The ALJ never admitted this exhibit into evidence.  In addition, while the ALJ initially considered the compliance report to be relevant factually, the ALJ changed his mind and repeatedly confirmed that ruling.  In his decision, the ALJ erroneously found that Student withdrew the compliance report during the hearing.  For the reasons discussed herein, however, this error was harmless.

Student's request was untimely.  Student filed the request for official notice with his closing brief.  As such, Student failed to identify the document as a proposed exhibit "at least five business days in advance of the hearing," as required by Cal. Educ. Code section §56505(e)(7)).  Student further failed to list the compliance report in a prehearing conference statement submitted three business days prior to the prehearing conference, in violation of OAH requirements.

In addition, this Court agrees that the compliance report was irrelevant.  Pursuant to Cal. Evid. Code section 452(h), a court may take judicial notice of "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy."  "Although the *existence* of a document may be judicially noticeable, the truth of statements contained in the document and its *proper interpretation are not subject to judicial notice* if those matters are reasonably disputable." *Unruh-Haxton v. Regents of University of California*, 162 Cal. App. 4th 343, 364 (2007) (citations omitted) (italics in original).  Here, Student sought to rely on the substance of the compliance report.  As the ALJ noted, however, the compliance report "reaches conclusions by construing settlement agreements and communications between the parties that fall outside the record in this matter, including communications that occurred after the October 7, 207 individualized education plan (IEP) meeting that framed the basis of the dispute."  Because the compliance report contained facts outside the scope of the hearing and relied on inadmissible settlement agreements, the ALJ did not err to deny the request for official notice.   Accordingly, the ALJ did not err to deny Student's request for official notice.

For the foregoing reasons, this Court shall afford due deference to the ALJ's findings of fact and conclusions of law.

**Whether the October 7, 2008 IEP Denied Student a FAPE**

**Background**

"The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive right to public education." *Hoeft v. Tuscon Unified Sch. Dist.*, 967 F.2d 1298, 1300 (1992) (citing *Honig v. Doe*, 484 U.S. 305, 310 (1988)).  The IDEA ensures that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. §1400(d)(1)(A).  According to the IDEA, a FAPE is

> special education and services that–(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the school standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. §1401(9).  To provide a FAPE in compliance with the IDEA, a state educational agency receiving federal funds must evaluate a student, determine whether that student is eligible for special education and services, conduct and implement an IEP, and determine an appropriate educational placement of the student. 20 U.S.C. §1414.

Student's FAPE must be "tailored to the unique needs of the handicapped child by means of an 'individualized educational program' (IEP)." *Hendrick Hudson Cent. Sch. Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 181 (1982) ("*Rowley*") (citing 20 U.S.C. §1401(18)).  The IEP, which is prepared at a meeting between a qualified representative of the local educational agency, the child's teacher, the child's parents or guardian, and, where appropriate, the child, consists of a written document containing

> (A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

20 U.S.C. § 1401(19). Local or regional educational agencies must review, and where appropriate revise, each child's IEP at least annually. 20 U.S.C. §§ 1414(a)(5), 1413(a)(11).  In addition, "[p]arental involvement is a central feature of the IDEA." *Hoeft*, 967 F.3d at 1300.  "Parents participate along with teachers and school district representatives in the process of determining what constitutes a 'free

1    appropriate education' for each disabled child." *Id*.,

2         Violations of the IDEA may arise in two situations.  First, a school district, in creating and

3    implementing the IEP, can run afoul of the Act's procedural requirements.  *Rowley*, 458 U.S. 176.

4    Second a school district can be liable for a substantive violation by drafting an IEP that is not reasonably

5    calculated to enable the child to receive educational benefits.  *Id*.  Through a FAPE, "the door of public

6    education must be opened for a disabled child in a 'meaningful' way." *Id*. at 192.  District must provide

7    Student a FAPE that is "appropriately designed and implemented so as to convey" Student with a

8    "meaningful" benefit. *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999).  Student alleges

9    that District violated the IDEA procedurally.

10                              **Student's Motion**

11        Student appeals the ALJ's conclusion that the District's offer at the October 7, 2008 IEP was not

12   predetermined and was not prepared without parental participation.[2]  Student argues that District violated

13   the IDEIA procedurally by making a predetermined offer without affording Mother a meaningful

14   contribution to the IEP.  Analysis of a procedural violation is a two-step process.  First, the Court

15   considers whether there was a procedural violation.  If so, then the Court considers whether the

16   "procedural violation results in the loss of educational opportunity or seriously infringes the parents'

17   opportunity to participate in the IEP formation process." *Napa Valley*, 496 F.3d at 938 (quoting *W.F.*

18   *v. Bd. of Trustees of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1484 (9th Cir. 1992) ("*Target*

19   *Range*")).  A child is only denied a FAPE if the second component is established.  "[N]ot all procedural

20   violations deny the child a FAPE." *Napa Valley*, 496 F.3d at 938.  "IDEA procedural error may be held

21   harmless[.]" *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 652 (9th Cir. 2005).

22        The ALJ concluded that:

23        District did not predetermine the offer it made at the October 7, 2008 IEP meeting and
          parent's input was meaningfully considered.  The evidence established that the District
24        members of the IEP team engaged in open dialogue with Mother and her attorney during
          the IEP meeting on October 7, 2008.  Their input, for example in the instance of data
25        collection, was not only considered, but it was incorporated into Student's IEP.

---

27        [2]The ALJ also concluded that the Student's transition plan was appropriate, Mr. Pekarek and Ms. Wu are qualified
     to act as Student's behavioral providers, and District's October 7, 2008 offer constituted a FAPE.  Student's memorandum
28   focuses on the alleged predetermination of the offer.  Accordingly, this Court limits this order to consideration of the
     predetermination issue only.

1  ALJ Decision, p. 15.   The ALJ's conclusion was based on, *inter alia*, the following facts:

2         At the October 7, 2008 IEP meeting, Mother, her attorney, and Mr. Pekarek
   "engaged in a lengthy discussion about how data collection would be performed by the
3  District.  Mr. Pekarek's opinion regarding data collection differed from the opinions of
   the ACES staff, Mother and her attorney.  The District members assented to Mother and
4  her attorney's demnads to keep the ACES data collection procedure in place, if and when
   the District's program was to be implemented.  The fact that the District's members
5  agred to take more data than they originally thought was appropriate, established that
   Mother's concerns were taken seriously and that she meaningfully engaged in the
6  decision making process.

7         Also at the October 7, 2008 IEP meeting, Mr. Pekarek explained Ms. Wu's
   credentials and her work experience to Mother and her attorney.  Toward the conclusion
8  of the October 7, 2008 IEP meeting, Mother and her attorney asked to meet Ms. Wu.  A
   District IEP team member telephoned Ms. Wu and instructed her to join the meeting,
9  which she did.  Obliging this request also shows active and meaningful participation by
   Mother in the IEP process.  Mother and her attorney [were provided] sufficient time to
10 inquired about Ms. Wu's qualifications.

11        While Ms. Wu was at the October 7, 2008 IEP meeting, she observed the
   proposed transition plan being discussed and Mr. Pekarek answering questions posed by
12 Student's attorney regarding the District program.  This discussion included a request to
   describe Mr. Pekarek and Ms. Wun generally in the IEP, rather than listing them only by
13 name.  This request stemmed from Mother's concern that if Mr. Pekarek and Ms. Wu
   became unavailable, then a generic description would ensure that someone with similar
14 credentials could replace them.  The District members agreed to use these generic
   descriptions, again showing Mother's meaningful participation in the October 7, 2008
15 IEP meeting.

16        The collaborative effort of Mr. Pekarek and Ms. WU, as well as ACES and
   Mother, resulted in the development of an appropriate transition plan.  The combined
17 testimony of Ms. Whitson, Mr. Pekarek, and Ms. Wu persuasively established that the
   offer made by the District at the October 7, 2008 IEP meeting regarding Student's
18 behavioral supervision was not predetermined and parental input was considered and, in
   fact, included in the offer.
19
         Mother confirmed that at the October 7, 2008 IEP, a discussion occurred between
20 her, her attorney and Mr. Pekarek regarding the data collection that the District program
   would use.  She also recalled her attorney asking Mr. Pekarek many questions about Ms.
21 Wu's qualifications.  Again, evidencing meaningful participation.

22        Ms. Hicinbothom testified that she was "sure [Mother] asked questions during
   the [October 7, 2008] IEP meeting," and that [Mother] and her attorney's practice were
23 to "frequently speak up at IEP meetings," thus confirming Mother's participation in the
   IEP process.
24
25 ALJ Decision, pp. 9, 11-12.

26        This Court agrees with the ALJ that there was no predetermination and Mother had an

27 opportunity to participate meaningfully in the development of the offer.  As the Ninth Circuit ruled in

28 *Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1032 (9th Cir. 2009):

1    District did not violate the Individuals with Disabilities Education Act's procedures when
2    it conducted a suitable functional behavioral assessment and subsequently proposed a
     behavior intervention plan.  The individualized education plan team and [Student's]
3    parents had an opportunity to discuss the plan when it was proposed. [Student's] mother
     exercised her rights by contesting the behavior plan and then challenging the plan
     through the statutory procedures.  There was no procedural violation.
4

5    Similarly, the record reflects that the ALJ did not err to find that Student's mother had an opportunity

6    to discuss the proposed offer of behavior services at the October 7, 2008 IEP meeting, and exercised her

7    right by contesting the offer.  Mother's objections to the proposed data collection were considered and

8    the IEP offer was amended to incorporated Mother's suggested changes.  District agreed to Mother's

9    request to include general qualifications to describe the proposed senior behavior supervisor and

10   behavior supervisor in the IEP offer.  After Mother expressed that she had not met Ms. Wu, District

11   addressed that concern by inviting Ms. Wu to attend the IEP.  Thus, Mother had an opportunity to

12   participate meaningfully in the process, and exercised her right to do so in a number of ways.  In

13   addition, Mother has challenged the offer through the appropriate procedures.

14        Student argues that District impermissibly predetermined the IEP offer because District

15   unilaterally chose not to renew its contract with ACES on July 1, 2008.  Student faults the ALJ for

16   erroneously concluding that the District "decided not to renew its contract with ACES" in November

17   2008.  Student argues that this error was not harmless, because the July 1, 2008 decision not to renew

18   supports predetermination, whereas a November 2008 decision does not.  The Court notes that District's

19   attorney, Student's attorney, and some witnesses stated on the record that District decided to terminate

20   services with ACES on November 30, 2008.  Superintendent Whitson clarified that District made the

21   decision not to renew its contract with ACES on July 1, 2008, but terminated services on November 30,

22   2008.  Although the ALJ's finding was factually erroneous, the record was less than clear on this point.

23   Moreover, the ALJ's error was harmless.

24        Although District chose not to renew its contract with ACES prior to the October 7, 2008 IEP,

25   and that decision was made outside of an IEP, there is no evidence that the offer made to Student was

26   predetermined.  On the contrary, District continued to pay for ACES to provide Student behavior

27   supervision services from July 1, 2008 through the October 7, 2008 IEP meeting.  Thus, although

28   District's contract with ACES was not renewed, there is no indication that District intended to terminate

13

1    Student's services provided by ACES unilaterally.  Additionally, the parties' stipulated that at the end

2    of the October 7, 2008 IEP, District's attorney told Mother and her attorney that District's offer would

3    not go into effect without parental consent.  This further supports the ALJ's conclusion that the IEP offer

4    was not predetermined and that the October 7, 2008 offer allowed parental participation.[3]

5           At the time of the October 7, 2008 IEP, District's offer was not made as a "take it or leave it"

6    proposal, without considering those most knowledgeable about Student and Student's parent.  "A school

7    district violates IDEA procedures if it independently develops an IEP, without meaningful parental

8    participation, and then simply presents the IEP to the parent for ratification." *Ms. S. v. Vashon Island*

9    *Sch. Dist.*, 337 F.3d 1115, 1131 (9th Cir. 2003).  Student relies on *Target Range*, 960 F.2d at 1464, for

10   its position that District's offer was predetermined impermissibly to violate the IDEA.  In *Target Range*,

11   the offer was made without consulting the Student's parents, the student's teachers, those persons

12   "knowledgeable" about the Student, or the Student's school. *Id*.  Based on these considerations, the court

13   found a procedural violation.  By contrast, District's offer was made in full support of Student's school.

14   Those knowledgeable about Student, including ACES behavior supervisor Ms. Hicinbothom, agreed

15   with the transition plan and believed it could be implemented in a successful and collaborative way.

16   Student's Mother was consulted and her concerns were considered and addressed.  Indeed, it is

17   undisputed that District agreed not to implement the offer without Mother's consent.

18          District did not deny Student a FAPE by presenting an offer with which Mother disagreed.

19   Although a student's parents have a right to meaningful participation in the development of an IEP, a

20   district "has no obligation to grant [a parent] a veto power over any individual IEP provision." *Vashon*

21   *Island*, 337 F.3d at 1131.  As the Ninth Circuit explained:

22            In discussing parents' participatory role in developing IEPs for their children, the
             [Supreme] Court observed that Congress, "apparently recognizing that [a] cooperative
23            approach would not always produce a consensus between the school officials and the
             parents, and that in any dispute the school officials would have a natural advantage, . .
24            . incorporated an elaborate set of what it labeled 'procedural safeguards' to insure the full
             participation of the parents and proper resolution of substantive disagreements." We
25            construe the Court's language as a recognition that, although the formulation of an IEP
             is ideally to be achieved by consensus among the interested parties at a properly

26

27          [3] Although not relevant to this motion, in which this Court considers a "snapshot evaluation," the Court notes that
     District continued to provide Student with ACES behavior services through the end of November 2008 when it terminated
28   services with ACES.

                                                    14

1    conducted IEP meeting, sometimes such agreement will not be possible. If the parties
     reach a consensus, of course, the [IDEA] is satisfied and the IEP goes into effect. If not,
2    the agency has the duty to formulate the plan to the best of its ability in accordance with
     information developed at [prior] meetings, but must afford the parents a due process
3    hearing in regard to that plan.

4    *Id*. at 1131-32 (quoting *Doe by Gonzales*, 793 F.2d 1470, 1490 (9th Cir. 1986), *aff'd sub nom*, *Honig*

5    *v. Doe*, 484 U.S. 305 (1988)).   The October 7, 2008 IEP offer was made after a culmination of

6    discussions between the IEP team of 15 individuals, having met previously to discuss the offer in May

7    2008, June 2008, and September 2008.  Mother and her attorney were involved actively in each of these

8    four meetings to discuss and form the IEP offer.  Although Mother did not agree to the offer as it related

9    to Mr. Pekarek and Ms. Wu, her disagreement alone does not constitute a denial of the IDEA's

10   procedural safeguards.  In addition, Mother was granted a due process hearing on the matter, and filed

11   a compliance complaint on the issue.  Accordingly, there was no procedural violation of the IDEA.

12       Based on these considerations, this Court finds that the ALJ did not err to conclude that the

13   October 7, 2008 IEP offer was not predetermined and that Mother participated meaningfully in the IEP.

14   Accordingly, Student's motion is denied.

15                                   **District's Motion**

16       District moves for summary judgment in its favor, arguing that the October 7, 2008 IEP provided

17   Student with a FAPE.   The ALJ ruled that the:

18       District's offer made during the October 7, 2008 IEP meeting would have provided
         Student with a FAPE.  The offer followed a thorough FBA, the District's observations
19       of Student and the District's consultation with Student's teachers and ACES staff.  The
         offer was made after meaningful parental participation, and was reasonably calculated
20       to provide some meaningful benefit.

21   ALJ Decision, p. 16.  Student's opposition to the District's motion contains the same challenges and

22   arguments as his affirmative motion for summary judgment.  Student argues that the Court should not

23   give deference to the ALJ's decision because the ALJ was not impartial, and his analysis was not

24   thorough. The Court rejects these arguments for the reasons discussed above.  For the following reasons,

25   this Court affirms the ALJ's conclusion that the October 7, 2008 IEP provided Student a FAPE.

26       The ALJ's decision was based on his findings of fact and conclusions of law which were

27   thoughtful, thorough, and well-reasoned. This Court has read and reviewed the transcript of the hearing,

28   the administrative record, the parties' arguments, and legal authority.  Based on this review, this Court

15

1  finds that the ALJ's factual findings are supported by the record and support his legal conclusions.

2    The District's October 7, 2008 offer for the provision of behavior services was the same as those

3  services then-provided (approved by Mother) with one exception–District offered to change the behavior

4  supervision provider from ACES to the District and County.   Thus, the question presented is whether

5  the provision of services by Mr. Pekarek and Ms. Wu would provide Student with a FAPE.

6    Mother challenged the shift from ACES to the District and County provided services on two

7  basic grounds.   First, Mother challenged the experience and credentials of Mr. Pekarek and Ms. Wu.

8  The record supports the ALJ's position that Mr. Pekarek and Ms. Wu were qualified and had sufficient

9  experience to provide Student with a FAPE.   Indeed, Mr. Pekarek and Ms. Wu were equally, or more,

10  qualified than those providing services at ACES.   Second, Mother expressed her concern that the change

11  would hinder the "fidelity of services" provided to Student.   Mother explained that if the at-home and

12  in-school services were provided by different entities, the goals may not be implemented in the same

13  fashion and may hinder Student's progress.   Ms. Hicinbothom from ACES, however, explained that she

14  believed that she could work with District and County personnel collaboratively to implement Student's

15  goals.   In addition, clinical meetings held monthly would bring together in-home and at-school providers,

16  District and school employees, and parents to address any concerns that would arise in this regard.   Thus,

17  Mother had an opportunity to voice her concerns and the evidence demonstrated that those concerns

18  were addressed.

19    The evidence supports the ALJ's conclusion that the IEP was reasonably calculated to provide

20  Student with educational benefit and that Mother had an opportunity to participate meaningfully in the

21  offer.   School districts are required to provide only a "basic floor of opportunity." *Rowley*, 458 U.S. at

22  200-01.   Thus, an "'appropriate' public education does not mean the absolutely best or 'potential-

23  maximizing' education for the individual child." *Gregory K.*, 811 F.2d at 1314.   Here, the offer of Mr.

24  Pekarek, a BCBA program professor with many distinctions in the field of education of autistic children,

25  and Ms. Wu, a school psychologist with only one class left in her BCBA program, would have provided

26  Student with at least a basic floor of opportunity for a meaningful education.   Ms. Hicinbothom admitted

27  that she had not concerns with the qualifications and experience of Mr. Pekarek.   At the October IEP

28  meeting, Mother expressed her concerns over these individuals, their qualifications, and their experience.

16

To address those concerns, District agreed to describe the individuals in generic terms. Both Mr. Pekarek and Ms. Wu met the qualifications requested by Mother and described by the collaborative members of the IEP meeting. The ALJ did not err to conclude that the October 7, 2008 IEP offer provided Student with a FAPE. Accordingly, District's summary judgment motion is granted.

### PRELIMINARY INJUNCTION MOTION

### Introduction

The IDEIA requires that while parties dispute the appropriate placement of a student, the child is to remain in his or her "then current" educational placement. 20 U.S.C. §1415(j). Specifically, the statute provides:

> [D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child.

*Id.* California has adopted the federal "stay put," provision, which reads: "During the pendency of the hearing proceedings, including the actual state level hearing, the pupil shall remain in his or her present placement...unless the public agency and the parent agree otherwise." Cal. Edu. Code §56505(d). The IDEIA's "stay put" provision fails to define the "current educational placement." Courts agree that this phrase "is typically the placement described in the child's most recently implemented IEP." *Johnson*, 287 F.3d at 1180.

### Factual Background [4]

On April 14, 2009, while the underlying dispute was pending at the administrative level, Student filed a stay put motion with the OAH. On April 27, 2009, Administrative Law Judge Rebecca Freie ("ALJ") granted Student's stay put motion and ordered District to "continue to fund ABA services provided to Student pursuant to the August 25, 2007, settlement agreement as specified in the February 15, 2007, individualized educational program document." Stay Put Order, p. 4. The ALJ based her opinion and order on the following findings of fact and conclusions of law:

---

[4] Although Student moved for a preliminary injunction and stay put order, Student failed to provide any declarations to support the motion. In opposition to this motion, District submitted both the Order Granting Motion for Stay Put and a Declaration of Superintendent Whitson to set forth the facts relevant to this motion. Student does not dispute the order or facts presented.

On August 25, 2007, the parties resolved this dispute by executing a settlement agreement. This settlement agreement provided that an IEP dated February 15, 2007, would be implemented, with the exception of two provisions labeled as "items 15 and 16," in the IEP. These eliminated provisions permitted the District to provide Student with a behavior aide employed by the District for Student's home program, and also provided for support for that aide to be by District personnel. Other adopted provisions in the IEP of February 15, 2007, required the District to contract with a nonpublic agency (NPA), named ACES, to provide to Student ABA services both in school and in his home. The settlement agreement states that the program offered in that IEP document dated February 15, 2007, will "constitute [Student's] last agreed upon IEP.

The settlement agreement of August 25, 2007, clearly states that the IEP of February 15, 2007, will "constitute [Student's] last agreed upon IEP." There is no ambiguity in this portion of the agreement.

If the NPA had lost its certification...or ceased to operate, an analogy might be made to the program closure exception to stay put that has been applied in situations where a school district could no longer provide a program due to a school closure for budgetary concerns. However, this is not applicable in this case...Additionally, there is no evidence that the NPA cannot continue to provide these services to Student....Therefore, the program closure exception to stay put does not apply.

Because the settlement agreement of August 25, 2007, and hte IEP of February 15, 2007, are the last agreed upon placement for stay put purposes, and the evidence indicates that the District cancelled its contract with the NPA because the District believed it could provide those services with District personnel, Student's motion for stay put is granted. The District shall continue to fund services provided by ACES pursuant to the settlement agreement and underlying IEP.

Stay Put Order, pp. 3-4.

On October 20, 2010, the Interim Executive Director of ACES and Ms. Hicinbothom visited Superintendent Whitson at the District office. At that meeting, the ACES representatives informed Superintendent Whitson that ACES would no longer agree to provide behavioral supervision services to Student.

On October 22, 2010, District's attorney received a letter from Student's attorney which indicated that Mother had been informed that ACES was terminated its behavioral supervision services to Student.

Superintendent Whitson reviewed the Stay Put Order and the February 15, 2007 IEP. The services page of the February 15, 2007 IEP provides that District shall provide Student with behavioral supervision services through "NPA ACES or another NPA under contract with the District or SELPA." Superintendent Whitson contacted SELPA to inquire as to whether it has any NPAs that provide behavioral supervision services to students. Superintendent Whitson was informed that SELPA only had a contract with an NPA that provides services to students over the age of 18 years old. District

18

1 currently has no contracts with any California NPA that provides behavioral supervision services to

2 students.

3       On October 29, 2010, District sent a letter to Student's attorney to inform Student that District

4 was going to arrange for Mr. Pekarek and Ms. Wu to provide Student with behavioral supervision

5 services. On the same day, Student's attorney sent District a letter to inform District that Mother did not

6 consent to the implementation of behavioral supervision services by Mr. Pekarek and Ms. Wu.

7       On November 3, 2010, Student filed this motion for preliminary injunction. Student requests

8 this Court to enter an "automatic injunction" in its favor, and to order District to provide behavioral

9 supervision services to Student through an NPA.

10       On November 5, 2010, District's attorney sent a letter to Student's attorney to explain that it had

11 not implemented services by Mr. Pekarek and Ms. Wu because Mother did not consent to these services.

12 The letter explained that neither District nor SELPA had any contracts with NPAs to provide behavioral

13 supervision services to students under the age of 18, and that District could not provide Student with the

14 services of an NPA under contract with SELPA or the District. The letter reiterated District's offer of

15 behavioral services by Mr. Pekarek and Ms. Wu, and opined that such services were comparable to the

16 services provided by ACES. The letter concluded by informing Student that District would continue to

17 provide all facets of Student's IEP and services except for the provision of behavioral services since

18 Mother had refused the offered services. District seeks an order that the District's offer to provide Mr.

19 Pekarek and Ms. Wu behavioral supervision services should be implemented at this time.

20 **Standard of Review**

21       Although styled as a "preliminary injunction motion," where a court considers the stay put

22 request in the first instance, the statute "substitutes an absolute rule in favor of the status quo for the

23 court's discretionary consideration of the factors of irreparable harm and either a likelihood of success

24 on the merits or a fair ground for litigation and a balance of the hardships." *Johnson v. Special Educ.*

25 *Hearing Office*, 287 F.3 d 1176, 1180 (9th Cir. 2002) (quoting *Zvi D. v. Ambach*, 694 F.2d 904, 906 (2d

26 Cir. 1982)). When a party seeks to enjoin an existing stay put order, however, the court applies the

27 traditional preliminary injunction factors. *Id*.

28       Student asserts that he is entitled to an "automatic stay" pursuant to 20 U.S.C. §1415(j). In his

1   initial motion, Student assumed the proper standard to be an automatic stay, and neglected to mention

2   the existence of the prior stay put order.   In his reply, Student acknowledges the prior order, but

3   maintains that this Court should enter an automatic stay.   Student argues that he is not seeking to enjoin

4   the prior stay put order, he is merely trying to enforce it.

5        District cites and discusses the relevant authority related to the proper standard of review on a

6   motion to enjoin an existing stay put order, but does not argue with clarity that this Court should apply

7   the traditional preliminary injunction factors.   District does not address the factors in its opposition.

8        Although the parties do not raise the issue, this Court must apply the correct legal standard to this

9   motion.   This Court's preliminary injunction order is reviewed under an abuse of discretion standard.

10  *Earth Island Institute v. United States Forest Service*, 351 F.3d 1291, 1298 (9th Cir. 2003).   A reviewing

11  court considers de novo, however, whether this Court identified the correct legal rule to apply.   *United*

12  *States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc).   "A district court that applied the

13  incorrect legal standard necessarily abused its discretion." *N.D. v. State Dep't. of Educ.*, 600 F.3d 1104,

14  1111 (9th Cir. 2010).

15       The proper legal analysis of the instant motion includes consideration of the traditional

16  preliminary injunction factors.   In *Johnson*, the Ninth Circuit ruled that a "request to enjoin a preexisting

17  'stay put' order is handled appropriately by the district court's application of traditional preliminary

18  injunction analysis." 287 F.3d at 1180.   The Court explained that the "automatic injunction" cases are

19  "inapplicable" where, as here, a district court is requested "to enjoin a *preexisting* 'stay put' order." *Id*.

20  (emphasis in original).  Although Student has an "absolute right" to an "automatic injunction" in the first

21  instance, Student has a preexisting stay put order.   Student acknowledges that he is seeking "to enforce"

22  the preexisting stay put order.   Thus, in this motion, the "claim underlying the preliminary injunction

23  is that the stay-put provision applied.   In essence, the preliminary injunction is an injunction for an

24  injunction." *N.D.*, 600 F.3d at 1112.   Under these circumstances, where "a preliminary injunction

25  [motion] affects a stay-put invocation, not the stay-put invocation itself," the Court applies the traditional

26  preliminary injunction analysis. *Id*.

27       The Court may only grant a preliminary injunction "upon a clear showing that the plaintiff is

28  entitled to such relief." *Winter v. NRDC, Inc.*, 129 S. Ct. 365, 375, 172 L. Ed. 2d 249 (2008).  "Plaintiffs

seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest." *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009) (citing *Winter*, 129 S.Ct. at 374).  In considering the four factors, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 129 S.Ct. at 376 (quoting *Amoco Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531 542 (1987)); *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 651 (9th Cir. 2009).

## Likelihood of Success

Student must make a "clear showing" that he is "likely to succeed on the merits." 129 S.Ct. at 375-76; *Stormans Inc. v. Selecky*, 571 F.3d 960, 978 (9th Cir. 2009).  As explained more fully above, this Court has rejected the merits of Student's claim. Student appealed the ALJ's order, arguing that the October 7, 2008 IEP violated the IDEA because its was predetermined and failed to allow Mother meaningful participation in the development of Student's IEP.  Having reviewed the parties' arguments and the record, this Court found that the ALJ did not err to conclude that District's October 7, 2008 IEP was not predetermined, and Mother participated meaningfully in the development of Student's IEP and IEP offer.  Mother expressed concerns and objections to the offer at the October 7, 2008 IEP meeting. There is no evidence that District obstructed Mother's ability to discuss and object to the the offer. Rather, the evidence demonstrates that the offer was discussed by the full IEP group, including Mother, members of ACES, Student's teachers, administrators, and proposed behavior supervisors. Mother took advantage of her right to participate meaningfully by expressing concerns and objections to the offer. District considered Mother's contributions and accommodated some of Mother's requested changes to the IEP offer by changing the substance of the data collection requirements and describing generally the qualifications for the senior supervisor and supervisor offered to Student.  District requested Ms. Wu's presence at the IEP to address expressed concerns that Mother had regarding her qualifications and experience.  Based on these and other considerations, the Court finds that Student is unlikely to succeed on the merits of his claim.

Moreover, Student is unlikely to succeed on the merits of a motion to enforce the underlying stay

1   put order. The ALJ ordered District to provide Student with behavioral supervision services provided

2   by ACES. The ALJ's conclusion was based, *inter alia*, on a finding that the "program closure

3   exception" to the stay-put automatic injunction was inapplicable because "there is no evidence that the

4   NPA cannot continue to provide these services to Student." Stay Put Order, p. 3. Because ACES

5   unilaterally terminated behavioral services to Student, however, the undisputed evidence has changed

6   the facts upon which the ALJ's conclusion was based. Moreover, the parties agree that District can no

7   longer provide ACES services to Student, and the status quo of the stay put order cannot be maintained.

8   Accordingly, the ALJ's stay put order cannot be enforced as written.

9       District typically has the obligation to provide the "placement described in the child's most

10  recently implemented IEP." *Johnson*, 287 F.3d at 1180. Two exceptions to this rule have been carved

11  out to address situations in which implementation of the IEP is impossible. The ALJ addressed the first

12  exception in the Stay Put Order; namely, the school closure rule. Under this exception, if the student's

13  current educational placement becomes unavailable due to a school closure, the district is not required

14  to maintain a student in a closed school. Rather, a district is required "to provide the student with a

15  similar placement which closely replicates the last agreed-upon and implemented placement." Stay Put

16  Order, p. 2 (citing, *inter alia*, *Tilton v. Jefferson County Bd. of Educ.*, 705 F.2d 800, 805 (6th Cir. 1983),

17  *cert. denied*, 485 U.S. 1006 (1984)). The second exception is when a student transfers to a different

18  district. Under these circumstances, "[t]o the extent implementation of the old IEP is impossible, a

19  [district] must provide services that approximate, as closely as possible, the old IEP." *Vashon Island*,

20  337 F.3d at 1132. "This obligation, however, is not absolute." *Id*. The Ninth Circuit recognized that

21  under these circumstances, a stay put order must uphold the purposes of the stay put provision "while

22  taking into account the reality of a shift in responsible educational agencies." *Johnson*, 287 F.3d at 1182.

23      Student argues that District is required to contract with another NPA to "approximate, as closely

24  as possible, the old IEP." *Vashon Island*, 353 F. 3d. at 1134. District argues that it is required to

25  implement the last agreed-upon IEP only "to the extent possible," and that under the circumstances, its

26  offer to provide services through Mr. Pekarek and Ms. Wu comports with controlling law. Considering

27  the reasoning of the exceptions to the automatic stay put provision, this Court finds District's argument

28  persuasive.

Student argues that the IDEA mandates a stay put order to require District to provide the services of an NPA to replace ACES. Student contends that the IDEA's stay put provision sought to avoid the current situation, wherein the District unilaterally places a student. "The purpose of the 'stay put' provision is to strip schools of the 'unilateral authority they had traditionally employed to exclude disabled students...from school' and to protect children from any retaliatory action by the agency." *Johnson*, 287 F.3d at 1181 (quoting *Honig*, 484 U.S. at 323). Here, however, District did not act unilaterally to exclude Student from school, and did not act unilaterally to change the provision of services. ACES chose to terminate Student's services. Accordingly, the protections of the IDEA are not threatened absent the injunctive relief sought.

The unique factual circumstances presented support District's position that it is not required to provide Student with services through another NPA. It is undisputed that District is unable to continue to provide services through ACES. Additionally, there is no evidence that District is able to provide services through another NPA. On the contrary, the undisputed evidence demonstrates that neither District nor SELPA have a contract with another NPA to provide behavioral supervision services to Student. District offers Student the same services, and same aides as was included in the last agreed-upon IEP. District offers only to change the behavioral supervisor vendors. This Court finds the analysis and holding of *Johnson* to be applicable in this situation. In *Johnson*, an autistic child's behavioral plan was developed by one agency. When the child transferred to a new district, that district offered the same services, but changed the behavioral supervisors. Student challenged a stay put order to allow District's offer, arguing that the shift in behavioral supervisors violated the stay put provision. The Ninth Circuit disagreed:

> The definition of educational placement is not an exact one, rather it is a combination of different factors listed in the disjunctive. Here, the Hearing Office's "stay put" order preserves the tutors, goals, and plan [Student] used in his [prior IEP]; it only changes the plan supervisors. As the district court pointed out, [District's] personnel are highly qualified to supervise [Student's] program. Thus the "stay put" order correctly determined [Student's] "then current educational placement" and [Student] has very little likelihood of success in challenging the "stay put" order. In addition, because [District] offered comparable placement to [Student], no irreparable harm would befall [Student] by denying the preliminary injunction.

*Johnson*, 287 F.3d at 1182. Similarly, District's offer maintains the behavioral services and aide, while seeking only to shift the behavioral supervisors. As discussed more fully above, District's personnel are

1    highly qualified to supervise Student's behavioral plan.  Under these circumstances, District's offer is

2    "similar" to Student's "then current educational placement," *Johnson*, 287 F.3d at 1179, and the Court

3    is not compelled to order District to offer another NPA.  Accordingly, Student "has very little likelihood

4    of success." *Id*.

5    **Irreparable Harm Absent Injunction**

6        Next, the Court considers whether Student will suffer irreparable injury absent an injunction.

7    "Preliminary injunctive relief is available only if plaintiffs 'demonstrate that irreparable injury is *likely*

8    in the absence of an injunction.'" *Johnson v. Couturier*, 572 F.3d 1067, 1081 (9th Cir. 2009) (quoting

9    *Winter*, 129 S.Ct. At 375) (noting that the Supreme Court in *Winter* rejected the Ninth Circuit's

10    "possibility of irreparable harm" test).  Student has not presented evidence or argument on this factor.

11        In its review of the record, the Court finds no evidence to support a position that a transition from

12    ACES to the services provided by Mr. Pekarek and Ms. Wu would harm Student.  Ms. Hicinbothom,

13    Student's ACES behavior supervisor, agreed that the proposed transition was appropriate, and that she,

14    Mr. Pekarek and Ms. Wu would work collaboratively to implement the plan.  Other than Mother's

15    speculative concerns, there was no evidence that Mr. Pekarak and Ms. Wu were unqualified or that the

16    services provided by them would harm Student.  Based on the record, there is no evidence that Student

17    will suffer irreparable injury absent an injunction.

18        The changed circumstances complicate this Court's analysis of this factor.  In the administrative

19    hearing, Mother outlined three main concerns regarding District's offer of Mr. Pekarek and Ms. Wu.

20    First, Mother questioned their qualifications and experience.  Second, Mother expressed her concern that

21    the "fidelity of services" would be disrupted.  Third, Mother questioned the proffered transition.  Student

22    may argue that absent an injunction, Student would be harmed irreparably by a lack of qualifications and

23    experience of the proposed providers, the disruption of the fidelity of services, and a faulty transition

24    plan for the Student.  Because of the circumstances, however, Student's proposed injunctive relief relies

25    on unknown variables.  Certainly, a transition, that would cause a break in the "fidelity of services"

26    provided to Student, is inevitable, because all parties agree that ACES will no longer provide services

27    to Student.  Significantly, Student fails to identify an alternative NPA, and neither District nor SELPA

28    have a contract with any other NPAs.  This Court cannot determine whether this unidentified NPA

24

would comply with the IEP or would provide adequate services.  Student presents no evidence related to an alternative NPA, and no evidence to support its position that an alternative NPA would provide better services than those offered by District.  Thus, the Court cannot determine under these circumstances whether the requested injunction by Student would cause irreparable harm, or whether Student would be harmed irreparably absent the injunction.  Any argument absent evidence on the point would be speculative.  Because Student proposes no concrete alternative NPA, Student fails to establish irreparable injury absent an injunction.

### Balance of the Equities

The purpose of a a preliminary injunction is to preserve the status quo if the balance of equities so heavily favors the moving party that justice requires the court to intervene to secure the positions until the merits of the action are ultimately determined. *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830 (1981).  "Status quo" means the last uncontested status that preceded the pending controversy. *See, GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000).  Here, the status quo cannot be maintained.  Student is seeking a mandatory injunction that "goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored.'" *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1980) (quoting *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976)); *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009).  Because the status quo cannot be maintained, and this Court has no evidence as to whether another NPA exists or could implement Student's IEP fully and satisfactorily, the balance of the equities does not favor injunctive relief.

### Public Interest

Protecting Student's rights under the IDEA promotes the public interest.  In addition, protecting Student from unilateral action made by District promotes the public interest.  As discussed more fully above, however, Student's need for a stay put order was not created by the unilateral action of District. In addition, in carving out the school closure exception to the stay put provision's automatic injunction, courts have recognized a public interest "to enable school districts to manage their costs and to allow districts flexibility in administering their programs." Stay Put Order, p. 2.  Accordingly, the public interest factor is neutral.

**Conclusion**

Student is unlikely to succeed on the merits of his claims, and has failed to demonstrate irreparable harm absent a preliminary injunction.  The status quo has changed due to circumstances beyond the control of both parties, and cannot be maintained through injunctive relief.  Having balanced these factors, this Court denies Student's preliminary injunction motion.

**ORDER**

For the reasons discussed above, this Court:

1.      GRANTS District's summary judgment motion;

2.      DENIES Student's summary judgment motion;

3.      DENIES Student's preliminary injunction motion; and

4.      DIRECTS the clerk of court to enter judgment in favor of defendant District and against plaintiff Student, and to close this action.


        IT IS SO ORDERED.

**Dated:    November 24, 2010              /s/ Lawrence J. O'Neill**
                                    UNITED STATES DISTRICT JUDGE